## U.S. BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO (CLEVELAND)

IN RE:

MARITSA BROWN

<div style="text-align:center">Debtors</div>

CASE NO. 16-13420-jps

CHAPTER 13

JUDGE Jessica E. Price Smith

MOTION OF CIT BANK, N.A. FOR RELIEF
FROM STAY

**4848 LINCOLNSHIRE COURT,
BROADVIEW HEIGHTS, OH 44147**

CIT BANK, N.A., (the "Movant") moves this Court, under § 362 and other sections of
Title 11 of the United States Code, and under Federal Rule of Bankruptcy Procedure 4001, and
under Local Bankruptcy Rule 4001-1 for an order conditioning, modifying or dissolving the stay
imposed by Bankruptcy Code § 362.

### MEMORANDUM IN SUPPORT

1.        The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This
is a core proceeding under 28 U.S.C. § 157(b)(2).  The venue of this case and this Motion is
proper under 28 U.S.C. §§ 1408 and 1409.

2.        On September 19, 2007, the Debtors obtained a line of credit from IndyMac Bank,
F.S.B., A federally Chartered Savings Bank in the amount of $36,000.00.  Such line of credit was
evidenced by a Home Equity Line of Credit dated September 19, 2007 (the "Note"), a copy of
which is attached as **Exhibit A**.

3.        To secure payment of the Note and performance of the other terms contained in it,
the Debtor Maritsa Brown and non-filing co-debtor, Jeffrey D Brown executed an Open-End
Mortgage Secondary Lien (Securing Future Advances) in favor of IndyMac Bank, F.S.B., A

Federally Chartered Savings Bank dated September 19, 2007. (the "Security Agreement"). The

Security Agreement granted a lien on the real property (The "Collateral") owned by the Debtor

and non-filing co-debtor, Jeffrey D Brown, located at **4848 Lincolnshire Court, Broadview**

**Heights, OH 44147** and more fully described in the Security Agreement (check one):

        [X]    attached as **Exhibit B**;

        OR

        []    contained in the Note, attached as Exhibit **___**.

4.      The lien created by the Security Agreement was duly perfected by:

        [X]    Filing of the Security Agreement in the office of the Cuyahoga County Recorder on September 25, 2007.

        []    Filing of the UCC-1 Financing Statement in the office of _____ on _____ (date)

        []    Notation of the lien on the Certificate of Title.

        []    Other (state with particularity)_____.

5.      A copy of the Security Agreement, UCC-1 Financing Statement, Certificate of

Title or other document, as applicable, is attached as Exhibit B.

6.      The entity in possession of the original Note as of the date of this motion is CIT

BANK, N.A. .

7.      The entity servicing the loan is: LoanCare, LLC.

8.      The Note was transferred, as evidenced by the following:

        a)    If the Collateral is real estate:

        i.    Under Uniform Commercial Code § 3-203(a) as applicable under state law in effect where the property is located, from the original lender (check only one):

[ ] N/A.

OR

[ ] By Endorsement of the Note, Payable to:
_____

OR

[X] By blank endorsement on the Note.

OR

[ ] By allonge attached to the Note, payable to:
_____.

OR

[ ] By blank allonge, attached to the Note.

OR

ii.       [ ] The Note is not endorsed to the Movant, or is not endorsed in blank with an allegation that the Movant is in possession of the original Note. The factual and legal basis upon which the Movant is entitled to bring this motion is (explain with particularity and attach supporting documentation:

_____

_____

OR

[ ] By endorsement on the Note or by allonge attached to the Note, through a power of attorney. If this box is checked, a copy of the power of attorney is attached as Exhibit ____. Explain why it provides Movant the authority to endorse the Note:

iii.      Under Uniform Commercial Code § 3-203(a) as applicable under state law in effect where the property is located, from <the first transferee> to _____. ADD ADDITIONAL TRANSFER SECTIONS AS APPROPRIATE. THE LAST TRANSFEREE MUST BE THE MOVANT.

iv.      A Court has already determined that Movant has the ability to enforce

the Note with a judgment dated <INSERT DATE OF JUDGMENT> in <INSERT NAME OF COURT>. A copy of the judgment is attached as Exhibit ____.

     v.     Other (explain): _____

    b)     If the Collateral is not real estate (check one):

    [X] N/A.

    OR

    [] From the original lender to <FIRST TRANSFEREE> by <STATE METHOD OR DOCUMENT EFFECTING TRANSFER> [ADD ADDITIONAL TRANSFER SECTIONS AS APPROPRIATE. THE LAST TRANSFEREE MUST BE THE MOVANT.]

9.    The Security Agreement was transferred as follows:

    [ ] N/A.

    OR

    [X] Assignment of Mortgage History:

        From Federal Deposit Insurance Corporation as Receiver for IndyMac Federal Bank, F.S.B., Successor to IndyMac Bank, F.S.B. on January 25, 2010 to OneWest Bank, FSB. The transfer is evidenced by the document(s) attached to this Motion as **Exhibit C**.

        AND

        From OneWest Bank, National Association on July 27, 2015 to CIT Bank, N.A via Articles of Merger/Share Exchange. The transfer is evidenced by the document(s) attached to this Motion as **Exhibit D**.

10.    The 2018 value of the Collateral is $400,300.00. This valuation is based on the

Cuyahoga County Auditor Report. Attached is a copy of the Cuyahoga County Auditor

Report, **Exhibit E**.

11.    As of October 1, 2019, there is currently due and owing on the Note the outstanding principal balance of $31,440.42, plus interest accruing thereon at the rate of 0.0000% per annum [$0.00 per day] from February 21, 2015, as described in more detail on the worksheet.  The total provided in this paragraph cannot be relied upon as a payoff quotation.

12.    The amount due and owing on the Note as set forth in paragraph 11 Does Not include a credit for the sum held in a suspense account by the Movant.  The amount of the credit is $0.00.

13.    Other parties known to have an interest in the Collateral besides the Debtors, the Movant, and the trustee as (check all that apply):

[ ]    N/A.

[ ]    The Cuyahoga County Treasurer, for real estate taxes in the amount of _____.

[X]    Co-Owners:
       Jeffrey D Brown may claim an interest in the subject property as he is a signor on both the Note and the Security Agreement.

[ ] Parties holding additional liens:

14.    The Movant is entitled to relief from the automatic stay under Bankruptcy Code § 362(d) for these reason(s) (check all that apply):

[ ] Debtor has failed to provide adequate protection for the lien held by the Movant for these reasons (explain):_____.

[] Debtor has failed to  keep the Collateral insured as required by the Security Agreement.

[] Debtor has failed to keep current the real estate taxes owed on the Collateral.

[X] Debtor has failed to make periodic payments to Movant for the months of July 2016 to October 2019, which unpaid payments are in the aggregate amount of $3,900.00 as of October 1, 2019. If any months come due and owing, those too shall be incurred. The total provided in this paragraph cannot be relied upon as a reinstatement quotation.

[ ] Debtor is delinquent in funding the plan, and therefore the trustee has failed to make periodic payments to Movant since the commencement of the bankruptcy case for the months of through,which unpaid payments are in the aggregate amount of $ The total provided in this paragraph cannot be relied upon as a post-petition reinstatement quotation.

[ ] Debtor has no equity in the Collateral, because Collateral is valued at __, and including the Movant's lien, there are liens in an aggregate amount of $__ on the Collateral.

[] Debtor's plan provides for surrender of the Collateral.

[ ] The property is not necessary to an effective reorganization because
_____.

[ ] Other cause (set forth with specificity):

_____.

15.     Movant has completed the worksheet, attached as **Exhibit F**.

**WHEREFORE**, Movant prays for an Order from the Court granting Movant relief from stay of Bankruptcy Code § 362 to permit Movant to proceed under applicable non-bankruptcy law.

Respectfully Submitted,

  /s/ Steven H. Patterson
Steven H. Patterson
Attorney for Movant
Reisenfeld & Associates LLC
3962 Red Bank Road
Cincinnati, OH 45227
voice: (513) 322-7000
facsimile: (513) 322-7099
e-mail: ohbk@rslegal.com

<u>**CERTIFICATE OF SERVICE**</u>

       I certify that on the __25th__ of _____October_____, 2019, a true and correct copy of CIT Bank, N.A.'s Motion for Relief from Stay was served:

Via the Court's electronic case filing system on these entities and individuals who are listed on the Court's Electronic Mail Notice List:

             Patrick D. Miller, Debtor`s Counsel
             pmiller@lawlh.com
             Via ECF Mail

             Lauren A. Helbling, Bankruptcy Trustee
             ch13trustee@ch13cleve.com
             Via ECF  Mail

             U.S. Trustee
             ustpregion09.cl.ecf@usdoj.gov
             Via ECF Mail

And by Regular U.S. Mail, postage prepaid on:

             Maritsa Brown, Debtor
             4848 Lincolnshire Court
             Broadview Heights, OH 44147-2151

             Jeffrey Brown
             4848 Lincolnshire
             Broadview Heights, OH 44147

                                     /s/ Steven H. Patterson
                                   Steven H. Patterson

| | |
|---|---|
| JEFFREY D BROWN and MARISSA BROWN | INDYMAC BANK, ●.S.B., A FEDERALLY CHARTERED SAVINGS BANK<br>BLDG B, 901 E 104TH ST, SUITE 400/500<br>KANSAS CITY, MO 64131 |
| | **Lender's Name and Address**<br>"We," "us" or "our" means the lender named above. |
| **Address**<br>4848 LINCOLNSHIRE COURT<br>BROADVIEW HEIGHTS, OH 44147 | No. ▇▇▇▇▇▇▇<br>Date   September 19, 2007<br>Credit Limit $  36,000.00<br>Draw Period   120 MONTHS<br>Repayment Period   120 MONTHS<br>Maturity Date: October 15, 2027 |
| **Borrower's Name and Address**<br>"You" or "your" means each borrower above,<br>jointly and severally. | |

# HOME EQUITY LINE OF CREDIT

1.  **GENERALLY:** This agreement (the "Agreement") sets out the terms and conditions of your home equity line of credit (the "Line of Credit" or the "Line of Credit Account"). Many of the terms we use in this Agreement have special meanings:

    - The "Line of Credit Account Balance" is the sum of the unpaid principal of loans made under your Line of Credit, plus unpaid but earned finance charges, plus any costs, expenses, and fees that are due.
    - The "Credit Limit" is the maximum amount of principal we ordinarily will allow you to owe us under your Line of Credit at any time.
    - The "Billing Cycle" means the period of time normally covered by monthly periodic statements and includes such period of time even when a statement is not sent because there is no balance on your Line of Credit Account for that period.
    - An "Equity Card" is any credit card we issue to allow you to obtain advances on your Line of Credit.
    - The "Draw Period" is the period during which you may request advances on your Line of Credit.
    - The "Repayment Period" is the period during which you must repay your Line of Credit Account Balance and may not request further advances.

    If any term of this Agreement violates any law or for some other reason is not enforceable, the term will not be part of this Agreement.

2.  **PROMISE TO PAY:** You promise to pay to us, or our order, the total principal of all loans made under your Line of Credit, together with all finance charges, costs, expenses, and fees for which you are responsible under this Agreement. If there is more than one of you, each is jointly and severally liable on this Agreement. This means that we can require any one of you to pay all amounts due under this Agreement, including loans made to any of you, even if in excess of the authorized Credit Limit. Each of you authorizes any other Borrower, on his or her request alone, to cancel the Line of Credit, request and receive advances of principal under your Line of Credit, and to do all actions in connection with the terms of this Agreement. We can release any of you from responsibility under this Agreement, and the others will remain fully responsible hereunder.

3.  **TAX DEDUCTIBILITY:** You understand that we (including our employees and representatives) do not make any representations or warranties to you about the tax consequences -- including the deductibility of interest or fees -- of you establishing or using this Line of Credit, and we will not be liable if interest or fees are not deductible. You should consult a tax advisor regarding the deductibility of interest and charges under your Line of Credit.

4.  **REQUESTING A LOAN:** During the Draw Period, you may request a loan under your Line of Credit by the following methods:

    - You write a special check that we have given you for this purpose (the "Equity Check").
    - You use an Equity Card for purchase transactions or cash advances.
    - You authorize us to pay a designated third person or account.

    You may not obtain advances under the Line of Credit until any rescission period provided by federal law has expired and we are reasonably satisfied that none of the persons entitled to rescind had rescinded this Agreement and the Line of Credit.

**Indymac Bank**
**Multistate HELOC Agreement - I/O Min Pay**



When you request a loan, we will advance exactly the amount you request. The smallest amount we will advance to you when you use an Equity Check is $ ___250.00___ (the "Minimum Advance"). We will make the advance by depositing the amount in your transaction account, by advancing the money directly to you, or by paying a designated third person or account, depending on how we agree to make the advance. We will record the amount as a loan in your Line of Credit Account.

If you request a loan by writing an Equity Check for less than the Minimum Advance, we may, at our option, grant the request. However, granting the request does not mean we will be required to grant requests for less than the Minimum Advance in the future. We always have the option to deny any such request.

By signing below, each of you requests that we issue each of you an Equity Card. Your use of this Equity Card at automated teller machines is subject to our rules relating to automated teller machine transactions.

We will not ordinarily grant any request for a loan that would cause the unpaid principal balance of your Line of Credit Account to be greater than the Credit Limit listed in this Agreement. We may, at our option, grant such a request without obligating ourselves to do so in the future.

Loans under your Line of Credit may be for any lawful purpose, except that you may not use such loans to pay amounts due on your Line of Credit Account. You will notify us immediately in the event any of your Equity Checks or any of your Equity Cards are lost or stolen.

5.      **HOW PERIODIC FINANCE CHARGES ARE COMPUTED:** Finance charges begin to accrue immediately when we make a loan to you. To figure the finance charge for a Billing Cycle, we apply a daily periodic rate of FINANCE charge to the "average daily balance" of your Line of Credit Account for the Billing Cycle. We then multiply that figure by the number of days in the Billing Cycle. The average daily balance is computed as follows. First we take your Line of Credit Account Balance at the beginning of each day and subtract any unpaid finance charges that are due. Next, we subtract the portion of any payments or credits received that day that apply to the repayment of your loans. (A portion of each payment you make is applied to finance charges.) Then we add any new loans made that day. This gives us the daily balance. Then we add up all the daily balances for the Billing Cycle and divide the total by the number of days in the Billing Cycle. This gives us the "average daily balance."

Until the end of the ___1st___ Billing Cycle after the date of this Agreement (the "Initial Rate Period"), the daily periodic rate of **FINANCE CHARGE** is ___0.023973___ % which corresponds to an **ANNUAL PERCENTAGE RATE** of ___8.750___ %. The annual percentage rate corresponding to the periodic rate includes interest and not other costs.

The periodic rate and corresponding annual percentage rate described above are the initial rates assessed under this Line of Credit, and are not based on the formula used for later rate adjustments. Had these rates been based on that formula, the daily periodic rate of **FINANCE CHARGE** would have been ___0.023973___ %, which corresponds to an **ANNUAL PERCENTAGE RATE** of ___8.750___ %. At the end of the Initial Rate Period specified above, the rates will be subject to further adjustments and limitations, as described below under the heading **Variable Rate.**

6.      **VARIABLE RATE:** The "annual percentage rate" referred to in this section is the annual rate that corresponds to the periodic rate applied to the balance as described above. The annual percentage rate may change, and will be ___500/1000ths___ _____ percentage points ( ___0.500___ ) above the following "base rate:" the highest base rate on corporate loans posted at large U.S. money center commercial banks as published in the Money Rates table of The Wall Street Journal as the Prime Rate. The annual percentage rate may increase if this "base rate" increases. An increase will take effect on the first day of the Billing Cycle. An increase will result in an increase in the finance charge and it may have the effect of increasing your periodic minimum payment. The annual percentage rate will not increase more often than once a month. A decrease will have the opposite effect of an increase described above.



If the base rate changes more frequently than the annual percentage rate, we will always use the base rate in effect on the day we adjust the annual percentage rate to determine the new annual percentage rate. In such a case, we will ignore any changes in the base rate that occur between annual percentage rate adjustments.

This corresponding **ANNUAL PERCENTAGE RATE** will never exceed 18%, and will never exceed the highest allowable rate for this type of Agreement as determined by applicable state or federal law.

See the Fee Schedule attached hereto and made a part hereof for additional finance charges and other charges on your Line of Credit.

7. **MONTHLY PAYMENTS:** We will send you a periodic statement for each Billing Cycle in which there is a balance owing under your Line of Credit, or a credit balance, or a finance charge is imposed. The periodic statement will show, among other things, the amount of the minimum monthly payment (the "Minimum Payment") and the date by which it is due. You must pay us at least the Minimum Payment indicated on the periodic statement by the date indicated on the statement.

During the **Draw Period**, the Minimum Payment is the amount, if any, by which your outstanding principal loan balance exceeds your Credit Limit, plus the greater of: (a) $100.00; or (b) the amount of accrued but unpaid finance charges, late charges, and any other charges authorized by this Agreement, including, without limitation, any expenses or advances incurred by us under the Security Instrument, as described below under the heading **Security**. During the Draw Period the minimum payment may not fully repay the principal that is outstanding on your Line of Credit.

During the **Repayment Period**, the Minimum Payment is the amount, if any, by which your outstanding principal loan balance exceeds your Credit Limit, plus: (a) the amount of accrued but unpaid finance charges, late charges, and any other charges authorized by this Agreement, including, without limitation, any expenses or advances incurred by us under the Security Instrument; and (b) _____.8333_____ % of the principal balance outstanding on the last day of the Draw Period.

If your Minimum Payment includes any other items authorized by this Agreement, we will so advise you, and the periodic statement will include an itemization of such amounts.

You must send all payments to our attention at the address indicated on the periodic statement.

**FINAL PAYMENT:** On the maturity date listed in this Agreement, you must pay the amount of any remaining Line of Credit Account Balance outstanding. The minimum payments may not be sufficient to fully repay the principal that is outstanding on your Line of Credit. If they are not, you will be required to pay the entire outstanding balance in a single balloon payment.

We are not obligated to refinance your loan at that time, but will consider your request to do so. If you refinance this account at maturity, you may have to pay some or all of the closing costs normally associated with a new loan even if you obtain financing from us.

8. **ADDITIONAL REPAYMENT TERMS:** If your Line of Credit Account Balance on a payment date is less than the amount of the Minimum Payment, your minimum monthly payment will equal the Line of Credit Account Balance.

You can pay off all or part of what you owe at any time. However, so long as you owe any amount you must continue to make your periodic Minimum Payment.

The amounts you pay will be applied first to any fees and charges you owe other than principal and finance charges, then to any finance charges that are due, and finally to principal.

9. **SECURITY:** We have secured your obligations under this plan by taking a security interest (by way of a separate security agreement, mortgage, deed of trust, or other instrument (the "Security Instrument") dated _September 19, 2007_____, in the following property, described by item or type (the "Property"): _4848 LINCOLNSHIRE COURT, BROADVIEW HEIGHTS, OH 44147_____

Property securing any other loans that you have with us may also secure this Agreement. You may buy property insurance from anyone you want who is acceptable to us.

**Florida:** The state documentary tax due on this Agreement has been paid on the mortgage securing this indebtedness. You agree to pay additional taxes or other changes to the extent such amounts may be imposed by third parties or government authorities in connection with any event of borrowing under this Line of Credit.

You consent to a continuing writ of garnishment effective with respect to any money, salary, or wages as may be owed to us to the fullest extent permitted by law. This consent is given pursuant to Florida Statutes Section 222.11(2).

**Indymac Bank**
**Multistate HELOC Agreement - I/O Min Pay**

**Maryland Recordation Tax:** If the entire principal amount of the Line of Credit is not disbursed by us to you upon the execution of this Agreement, you may, at your option, pay Maryland recordation tax on the entire principal amount of the Line of Credit at the time of closing, or you may pay Maryland recordation tax at the time of making of the initial and each future advance from us to you. If you pay the Maryland recordation tax on the entire principal amount of the Line of Credit at the time of closing, your total tax liability will be satisfied, regardless of the amount of any future advances that may subsequently be made by us to you. If, however, you elect to pay the required Maryland recordation tax as advances are made, you have seven (7) days to file with the clerk of the court where the security instrument is recorded a verified statement of the amount of the additional debt incurred as each advance is made, and you must pay the applicable Maryland recordation tax on that additional debt, or you may be penalized by a fine of up to $500.00 or imprisonment of up 6 months for failing to do so as provided in § 14-1012 of the Tax Property Article of the Annotated Code of Maryland.

**North Carolina:** This is an equity line of credit Agreement as defined in Section 45-81 of the North Carolina General Statutes. In accordance with the NCGS Section 75-30, you agree to accept all telephone calls made by us through the use of automatic dialing machines.

**Washington:** If this Agreement is signed by husband or wife, or by two or more unmarried individuals, each irrevocably authorizes us to charge the amount of any Equity Check signed by any one of you against the Line of Credit Account and consents to the use of Property identified in the Security Instrument as security for repayment of all such charges.

10. **CHANGING TERMS OF THIS AGREEMENT:** Generally, we may not change the terms of this Agreement. However, we may change the terms in the following circumstances:
   - If this is a variable rate plan, we may change the index and margin if the original index described in this agreement becomes unavailable. Any new index will have a historical movement similar to the original, and, together with a new margin, will produce a similar interest rate.
   - We may make changes that you have agreed to in writing.
   - We may make changes that unequivocally benefit you.
   - We may make changes to insignificant terms of this Agreement.
   - If we are required to send notice of a change in terms, we will send the notice to your address listed in this Agreement. (You should inform us of any change in address.)

11. **YOUR RIGHT TO TERMINATE YOUR RIGHT TO OBTAIN LOANS:**
   A. **Termination.** You may terminate your right to obtain loans by sending us a written notice that will become effective upon receipt by us. If more than one person signs this Agreement as Borrower, your right to obtain loans may be terminated by written notice pursuant to this paragraph signed by any one or more of such persons. We may also suspend your right to obtain loans pursuant to paragraph fourteen (14) below. You must notify the servicer at the following address or at a different address as required by servicer of your intent to terminate.
   **P.O. Box 3038, Evansville, IN 47730**

   B. **Effect of Termination.** Upon termination of your Line of Credit Account, you must continue to pay the minimum payment due on or before each payment due date until all amounts owed under this Agreement are paid in full. However, you may be required to repay all obligations immediately if we exercise our rights under paragraph thirteen (13) below. You must return unused Equity Checks upon termination. You may be required to pay an account termination fee pursuant to the Fee Schedule attached hereto and made a part hereof.

12. **COSTS OF COLLECTION:** You agree to pay all our costs, including reasonable attorneys' fees, that we incur in legal proceedings to collect or enforce this debt should you be in default.
   **Alabama:** You agree to pay our reasonable and actual attorneys' fees, incurred as a result of your default if the unpaid balance at the time of default exceeds $300.
   **Arkansas:** You agree to pay our reasonable and actual attorneys' fees, not to exceed 10% of the amount of principal and accrued interest, if you are in default.
   **California:** You agree to pay costs actually incurred for recording, mailing, publishing, and posting legally required notices, costs of postponement, not to exceed $50, litigation or trustee sale fees, and attorneys' fees allowed by law.

**Colorado, Missouri, New York, North Carolina, Oklahoma, South Carolina:** You agree to pay our reasonable attorneys' fees not in excess of 15% of the unpaid debt after default and referral to an attorney who is not our salaried employee, together with any assessed court costs and legal expenses, to the extent permitted by applicable law.

**Louisiana:** You agree to pay our costs of collection and reasonable attorneys' fees not in excess of twenty-five (25) percent of the unpaid debt after default and referral to an attorney for collection.

**Maine:** You will pay all costs, including reasonable attorneys' fees and legal costs, incurred by us in attempting to collect, or collecting, what is owed from any real estate that secures this Agreement. You will pay all costs except attorneys' fees incurred by us in attempting to collect, or collecting, any amounts owed from personal property securing this Agreement.

**New Hampshire:** You agree to pay all our costs, including reasonable attorneys' fees that we incur in legal proceedings to collect or enforce this debt should you be in default. If you successfully assert a partial defense or set off, or recoupment or counterclaim, the court may reduce the amount of attorneys' fees we may recover from you. If you prevail in any action or defense against us, you may recover the amount of reasonable attorneys' fees from us.

**Wisconsin:** If you default, you agree to pay our statutory fees and charges and statutory attorneys' fees when and to the extent authorized by the Wisconsin Consumer Act. Fees and charges include, but are not limited to, the disposition of any Property under Wis. Stat. Ann. §422.413, as amended.

13. **TERMINATION OF LINE FOR CERTAIN DEFAULTS:** We may terminate your Line of Credit Account, require you to pay the entire outstanding balance in one payment, and charge you a termination fee (if provided for in this Agreement) and fees related to the collection of the amount owing, if:

    (1) You engage in fraud or material misrepresentation in connection with your Line of Credit;

    (2) You fail to make a payment as required by this Agreement; or

    (3) Your action or inaction adversely affects the collateral or our rights in the collateral.

    In that instance, we may take other action short of termination, such as charging you a fee if you fail to maintain required property insurance and we purchase insurance. In the District of Columbia, the remedy of acceleration is subject to the provisions of D.C. Code Ann. §28-3312(5).

    Even if we choose not to use one of our remedies when you default, we do not forfeit our right to do so if you default again. If we do not use a remedy when you default, we can still consider your actions as a default in the future.

    In North Dakota, if permitted by applicable law, this obligation may be the basis for a personal action against the promisor or promisors in addition to other remedies allowed by law.

14. **SUSPENSION OF CREDIT AND REDUCTION OF CREDIT LIMIT:** We may prohibit you from obtaining additional extensions of credit, or reduce your Credit Limit if:

    (1) The value of the dwelling securing this home equity Line of Credit declines significantly below its appraised value for purposes of this Line of Credit;

    (2) We reasonably believe you will not be able to meet the repayment requirements due to a change in your financial circumstances;

    (3) Your payment history on this home equity Line of Credit is not satisfactory;

    (4) You are in default of an obligation of this Agreement or any agreement securing this Agreement, which shall include, but is not limited to, your ongoing obligation to supply us with information we feel we need to assess your financial condition;

    (5) A governmental action prevents us from imposing the annual percentage rate provided for in this Agreement;

    (6) The action of a governmental body adversely affects our security interest to the extent that the value of the security interest is less than 120% of the home equity Line of Credit;

    (7) The annual percentage rate corresponding to the periodic rate reaches the maximum rate allowed under this Line of Credit (if provided for in this Agreement); or

    (8) A regulatory agency has notified us that continued advances would constitute an unsafe and unsound practice.

    In the event that we suspend your right to additional advances or reduce your Credit Limit, we will send you notice of our decision at the address listed in this Agreement. (You should inform us of any change in your address.) If we have based our decision to suspend or reduce your credit privileges on an assessment of your financial condition or performance under your Line of Credit, and you believe that your situation has changed, you must request that we re-evaluate your situation, and reinstate your credit privileges.

Indymac Bank
Multistate HELOC Agreement - I/O Min Pay

15. **WAIVERS AND CONSENT:** To the extent not prohibited by law and subject to any required notice and opportunity to cure a default for failure to make a required payment, you waive protest, presentment for payment, demand, notice of acceleration, notice of intent to accelerate and notice of dishonor.

Wisconsin: In addition, subject to Wis. Stat. Ann. § 422.407, as amended, you will not assert any claims or defenses arising out of your Line of Credit against any person to whom we assign our rights under the Line of Credit (the assignee) if the assignee is unrelated to us, acquires the Line of Credit in good faith and for value, gives you a notice of the assignment, and has not received notice from you of your claims or defense within 12 months after the assignee mailed you the notice of assignment.

To the extent permitted by applicable law, you waive your right to the benefit of exemption as to your Property securing, or to secure, this Agreement. If required by law, we will provide you with separate written statement regarding the waiver of your right of exemption. In Indiana, you hereby waive any rights to relief from valuation and appraisement laws.

16. **REPRESENTATIONS AND WARRANTIES:** You represent and warrant to us that the information contained in the loan application, in each material respect, was true at the time the loan application was completed.

You represent and warrant to us that the terms of any existing Security Instrument on the Property permit us to enter into this Agreement and that the loans secured by such existing deed of trust or mortgage are current in all material respects and are not in default.

17. **LOAN CHARGES:** If your Line of Credit Account is subject to a law that sets maximum loan charges, and that law is finally interpreted so that the interest or other charges collected, or to be collected, in connection with your Line of Credit Account exceeds the permitted limits, then: (a) any such charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from you that exceeded permitted limits will be refunded to you. We will refund such excess either by reducing the principal owed under your Line of Credit Account or by making a direct payment to you. If we apply the excess toward reducing the principal balance, such reduction shall be treated as a partial prepayment hereunder.

18. **APPLICABLE LAW:** Federal law applies to certain aspects of this Agreement, including, but not limited to, the interest rate and related charges. The law of the state where you and the Property are located will apply to the extent legally required. If any term of this Agreement violates any law or for some reason is not enforceable, or becomes unenforceable, that term will not be part of this Agreement.

If the Lender listed on page one of this Agreement is not IndyMac Bank, F.S.B., the following provisions apply to this Agreement: This is to inform you that your loan is an alternative mortgage loan within the definition of the Federal Alternative Mortgage Transactions Parity Act of 1982 (the "Parity Act") (12 U.S.C. §§ 3801 et seq.) and the implementing regulations adopted by the Office of Thrift Supervision ("OTS") (12 C.F.R. §§ 560.220, referencing, 560.33, 560.34, 560.35 and 560.210). Your loan will be made by us in accordance with the Parity Act requirements of the OTS rather than the provisions of state law. In this regard, pursuant to the authority granted by the Parity Act and the OTS Parity Act regulations, certain state laws will not apply to this loan.

19. **CREDIT INFORMATION:** You agree to supply us with whatever information we reasonably feel we need to decide whether to continue this Line of Credit. We agree to make requests for this information without undue frequency, and to give you reasonable time in which to supply the information.

You authorize us to make or have made any credit inquiries we feel are necessary. You also authorize the person or agencies to whom we make these inquiries to supply us with the information we request.

As required by California law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations.

## ADDITIONAL TERMS

### YOUR BILLING RIGHTS -- KEEP THIS NOTICE FOR FUTURE USE
This notice contains important information about your rights and our
responsibilities under the Fair Credit Billing Act.

*Notify Us In Case of Errors or Questions About Your Bill*

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than 60 days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

- Your name and account number.
- The dollar amount of the suspected error.
- Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings, checking, share draft or other account, you can stop the payment on any amount you think is wrong. To stop the payment your letter must reach us three business days before the automatic payment is scheduled to occur.

*Your Rights and Our Responsibilities*
*After We Receive Your Written Notice*

We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your credit limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

*Special Rule for Credit Card Purchases*

If you have a problem with the quality of property or services that you purchased with a credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or the services. There are two limitations on this right:

(a) You must have made the purchase in your home state or, if not within your home state, within 100 miles of your current mailing address; and
(b) The purchase price must have been more than $50.

These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement for the property or services.

DEFAULT IN THE PAYMENT OF THIS LOAN AGREEEMENT MAY RESULT IN THE LOSS OF THE PROPERTY SECURING THE LOAN. UNDER FEDERAL LAW, YOU MAY HAVE THE RIGHT TO CANCEL THIS AGREEMENT. IF YOU HAVE THIS RIGHT, THE CREDITOR IS REQUIRED TO PROVIDE YOU WITH A SEPARATE NOTICE SPECIFYING THE CIRCUMSTANCES AND TIME UNDER WHICH YOU CAN EXERCISE THIS RIGHT.

Utah: THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS.

Missouri: ORAL AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE. TO PROTECT YOU (BORROWER) AND US (LENDER) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT.

Iowa: IMPORTANT: READ BEFORE SIGNING. THE TERMS OF THIS AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE. NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED. YOU MAY CHANGE THE TERMS OF THIS AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT. YOU ARE ENTITLED TO A COPY OF THIS AGREEMENT. YOU MAY REPAY THE UNPAID BALANCE AT ANY TIME WITHOUT PENALTY, AND IF THIS IS A CONSUMER CREDIT TRANSACTION YOU MAY BE ENTITLED TO RECEIVE A REFUND OF UNEARNED CHARGES IN ACCORDANCE WITH LAW.

Washington: PLEASE BE ADVISED THAT ORAL AGREEMENTS OR ORAL COMMUNICATIONS TO LOAN MONEY, EXTEND CREDIT, OR FOREBEAR FROM ENFORCING REPAYMENT OF THE DEBT ARE UNENFORCEABLE UNDER WASHINGTON LAW.

NOTICE TO CO-SIGNER: YOUR SIGNATURE ON THIS NOTE MEANS THAT YOU ARE EQUALLY LIABLE FOR REPAYMENT OF THIS LOAN. IF THE BORROWER DOES NOT PAY, THE LENDER HAS A LEGAL RIGHT TO COLLECT FROM YOU.

YOU SHOULD CHECK WITH YOUR LEGAL ADVISOR AND WITH OTHER MORTGAGE LIEN HOLDERS AS TO WHETHER ANY PRIOR LIENS CONTAIN ACCELERATION CLAUSES WHICH WOULD BE ACTIVATED BY A JUNIOR ENCUMBRANCE.

20. SIGNATURES: By signing below, you agree to the terms of this Agreement and you promise to pay any amounts you owe under this Agreement. You also state that you received a completed copy of this Agreement on today's date.

CAUTION - IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.

_____ (Seal)
JEFFREY D BROWN                    -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
MARITSA BROWN                      -Borrower

_____ (Seal)
                                   -Borrower

Pay To The Order Of

_____ (Seal)
                                   -Borrower

Without Recourse
IndyMac Bank, F.S.B.
By:

Betty A. Cotton
Assistant Vice President

Indymac Bank
Multistate HELOC Agreement - I/O Min Pay



# EXHIBIT B

After recording please return to:

INDYMAC BANK, F.S.B., C/O DOCUMENT
MANAGEMENT
*[Company Name]*

*[Name of Natural Person]*
BLDG B, 901 E 104TH ST, SUITE 400/500

*[Street Address]*

KANSAS CITY, MO 64131
*[City, State Zip Code]*



CUYAHOGA COUNTY RECORDER
PATRICK J. OMALLEY — 18
MORT 09/25/2007 03:04:49 PM
**200709250739**

——————————— *[Space Above This Line For Recording Data]* ———————————

# OPEN-END MORTGAGE
## Secondary Lien
### (Securing Future Advances)

**This Security Instrument is made within the provisions of the Ohio Mortgage Act,
ORC §§ 1321.51-60, as amended.**

Borrower has established a line of credit ("Home Equity Line of Credit") with Lender as evidenced by Borrower's Home Equity Line of Credit Agreement and Promissory Note dated the same date as this Security Instrument, and all renewals, extensions, modifications, replacements and substitutions thereof (collectively, the "Agreement"). Lender has agreed to make advances to Borrower under the terms of the Agreement. Such advances shall be of a revolving nature and may be made, repaid and remade from time to time. Borrower and Lender contemplate a series of advances to be secured by this Security Instrument. This Security Instrument shall also secure (1) the unpaid balance due from time to time, which may include advances made after this Security Instrument is delivered for recording, and (2) the maximum amount of unpaid loan indebtedness, exclusive of interest thereon, which may be outstanding at any time. The total outstanding principal balance owing at any one time under the Agreement (not including charges and collection costs which may be owing from time to time) shall not exceed   thirty six thousand and NO/100ths                       (U.S. $   36,000.00      ) plus interest thereon (the "Credit Limit"). That sum is referred to in the Agreement as the Credit Limit. The entire indebtedness under the Agreement, if not paid earlier, is due and payable on       October 15, 2027       or on such later date as may be permitted by Lender in writing, or at such earlier date in the event such indebtedness is accelerated in accordance with the terms of the Agreement and/or this Security Instrument.

## DEFINITIONS

Words used in multiple sections of this Security Instrument are defined below and other words are defined in Sections 3, 10, 12, 17, 19, and 20. Certain rules regarding the usage of words used in this Security Instrument are also provided in Section 15.

(A)   "Security Instrument" means this Open-End Mortgage, which is dated   September 19, 2007   , together with all Riders to this document.

(B)   "Borrower" is   JEFFREY D BROWN AND MARITSA BROWN ,   HUSBAND & wife

. Borrower is the mortgagor under this Security Instrument.

(C)   "Lender" is   INDYMAC BANK, F.S.B., A FEDERALLY CHARTERED SAVINGS BANK

.

Lender is a   Federal Savings Bank   organized and existing under the laws of United States of America   Lender's address is   155 NORTH LAKE AVENUE, PASADENA, CA 91101
Lender is the mortgagee under this Security Instrument.

(D)   "Agreement" means the Home Equity Line of Credit Agreement and Promissory Note signed by Borrower and dated   September 19, 2007   . The Agreement states Lender has agreed to make advances to Borrower under the terms of the Agreement, such advances to be of a revolving nature. The total outstanding principal balance owing at any one time under the Agreement (not including charges and collection costs which may be owing from time to time under the Agreement) not to exceed the Credit Limit of   thirty six thousand and NO/100ths   Dollars (U.S. $   36,000.00   ) plus interest. Borrower has promised to pay the total outstanding balance in Periodic Payments and to pay the entire debt in full not later than   October 15, 2027   .

(E)   "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(F)   "Account" means the debt evidenced by the Agreement, plus interest, any other charges due under the Agreement, and all sums due under this Security Instrument, plus interest.

(G)   "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower *[check box as applicable]*:

☐ Adjustable Rate Rider    ☐ Condominium Rider    ☐ Second Home Rider
☐ Balloon Rider    ☐ Planned Unit Development Rider    ☐ Biweekly Payment Rider
☐ Home Improvement Rider    ☐ Revocable Trust Rider
☐ Other(s) *[specify]*

(H)   "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(I)   "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

Ohio Open-End Mortgage – Secondary Lien
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

Page 2 of 15

**(J)** "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K)** "**Escrow Items**" means those items that are described in Section 3.

**(L)** "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(M)** "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the Agreement and the Account.

**(N)** "**Periodic Payment**" means the amount due from Borrower to Lender each month for (i) principal and/or interest under the Agreement, and all late charges and other charges provided herein or authorized by the Agreement, plus (ii) any amounts under Section 3 of this Security Instrument.

**(O)** "**RESPA**" means the Real Estate Settlement Procedures Act (12 U.S.C. § 2601 *et seq.*) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to the escrow account requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Agreement and the Account do not qualify as a "federally related mortgage loan" under RESPA.

**(P)** "**Successor in Interest of Borrower**" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Agreement and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (a) the prompt repayment of the Account evidenced by the Agreement, and all renewals, extensions and modifications of the Agreement, with interest thereon at the rate provided in the Agreement; (b) the payment of all other sums due under the Agreement, with interest thereon at the rate provided in the Agreement, (i) advanced to protect the security of this Security Instrument, (ii) incurred by Lender in connection with the enforcement of its rights under this Security Instrument and/or the Agreement, and/or (iii) required to be paid as set forth herein or in the Agreement; and (c) the performance of Borrower's covenants and agreements under this Security Instrument, the Agreement and any prior mortgage or deed of trust.

For this purpose, Borrower does hereby mortgage, grant and convey to Lender, with mortgage covenants, the following described real property located in the

County          of    CUYAHOGA          :
*[Type of Recording Jurisdiction]*          *[Name of Recording Jurisdiction]*

SEE EXHIBIT A ATTACHED HERETO AND MADE A PART HEREOF

Prior Instrument Reference: Vol.          , Page

Parcel No.: :

which currently has the address of         4848 LINCOLNSHIRE COURT
                                             *[Street]*

BROADVIEW HEIGHTS    , Ohio       44147         ("Property Address").
    *[City]*                                 *[Zip Code]*

      TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

      BORROWER COVENANTS with Lender and its heirs, assigns, and successors, that he is lawfully seised in fee simple of the granted premises; that they are free from all encumbrances; that Borrower has good right to sell and convey the same; and that he does warrant and will defend the same to Lender and its heir, assigns, and successors, forever, against the lawful claims and demands of all persons.

      THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

      UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
      **1. Payment of Principal, Interest and Other Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Agreement and if allowable under Applicable Law, any prepayment charges, late charges and other charges due under the Agreement. Payments due under the Agreement and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Agreement or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Agreement and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.
      **2. Application of Payments or Proceeds.** Payments are deemed received by Lender when received at the location designated in the Agreement or at such other location as may be designated by Lender in accordance with the notice provisions in Section 14 or in such manner or location as required under Applicable Law. Except as otherwise described in this Section 2, and as permitted under Applicable Law, all payments accepted and applied by Lender shall be applied to the outstanding Account balance in the following order of priority: (i) any prepayment charges due under the Agreement and/or this Security Instrument if permitted by Applicable Law; (ii) amounts due under this Security Instrument to secure the amounts advanced under the Account and to protect Lender's security; (iii) any escrow payments under Section 3 of this Security Instrument, if Lender requires such payments; (iv) any late charges; (v) any other fees and charges other than finance charges; (vi) accrued and unpaid finance charges due under the Agreement; and (vii) any unpaid principal balance due under the Agreement.

Ohio Open–End Mortgage – Secondary Lien
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
                         Page 4 of 15

Situated in the City of Broadview Heights, County of Cuyahoga and State of Ohio: and known as being Sublot No. 25 in the Sutton Woods Estates - Phase I Subdivision of part of Original Brecksville Township Lot Nos. 13 and 18, as shown by the recorded Plat in Volume 316 of Maps, Page 38-41 of Cuyahoga County Records, as appears by said plat.

PN: 582-20-026

Property Address: 4848 Lincolnshire Court, Broadview Heights, Ohio 44147



If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. To the extent permitted by Applicable Law, voluntary prepayments shall be applied first to any prepayment charges and then as described in the Agreement.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Agreement shall not extend or postpone the due date, or change the amount of the Periodic Payments.

3. **Funds for Escrow Items.** Subject to Applicable Law, Borrower shall pay to Lender on the days Periodic Payments are due under the Agreement, until the Account is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums. These items are called "Escrow Items." At origination or at any time during the term of the Agreement, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section 3. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender the Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 8. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 8 and pay such amount and Borrower shall then be obligated under Section 8 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 14 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA to mean the amount by which a current escrow balance falls short of the target balance at the time of escrow analysis, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount



necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA to mean the amount of the negative balance in the escrow account, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. Borrower shall not be obligated to make such payments of Funds to Lender to the extent that Borrower makes such payments to the holder of a prior mortgage or deed of trust if such holder is an institutional lender. If under Section 21 the Property is sold or the Property is otherwise acquired by Lender, Lender shall apply no later than immediately prior to the sale of the Property or its acquisition by Lender, any Funds held by Lender at the time of application as a credit against the sums secured by this Security Instrument.

4.   **Charges; Liens.**  Borrower shall perform all of Borrower's obligations under any mortgage, deed of trust, or other security agreement with a lien which has priority over this Security Instrument.  Borrower shall pay when due, all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any.  To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien other than a lien disclosed to Lender in Borrower's application or in any title report Lender obtained which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with the Agreement, the Account and this Security Instrument, if allowed under Applicable Law.

5.   **Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.  This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the term of the Agreement.  The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably.  Lender may require Borrower to pay, in connection with the Agreement, the Account and this Security Instrument, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification.  Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.  Any amounts disbursed by Lender under this Section 5, shall be added to the unpaid balance of the Account and interest shall accrue at the rate set forth in the Agreement, from the time it was added to the unpaid balance until it is paid in full.



Subject to Applicable Law, all insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee, and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Agreement and the Account up to the amount of the outstanding Account balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage not otherwise required by Lender, for damage to, or destruction of the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee, and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Agreement and the Account up to the amount of the outstanding Account balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, and subject to the rights of any holder of a mortgage, deed of trust, or other security agreement with a lien which has priority over this Security Instrument, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect the Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds, and shall be the sole obligation of Borrower. Subject to the rights of any holder of a mortgage, deed of trust, or other security agreement with a lien which has priority over this Security Instrument, if the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Lender believes that Borrower has abandoned the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 21 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Agreement, the Account or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Subject to the rights of any holder of a mortgage, deed of trust, or other security agreement with a lien which has priority over this Security Instrument, Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Agreement, the Account or this Security Instrument, whether or not then due.

6.  **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. If the Property is damaged, unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or



condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

7. **Borrower's Home Equity Line of Credit Application.** Borrower shall be in default if, during the home equity line of credit application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Agreement, the Account and this Security Instrument. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

8. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which has or may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Lender believes that Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has or may attain priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees resulting from any suit or activity, to the extent permitted by applicable law, to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 8, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 8.

Any amounts disbursed by Lender under this Section 8 shall become additional debt of Borrower secured by this Security Instrument if allowed under Applicable Law. These amounts shall bear interest at the rate set forth in the Agreement from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

9. **Mortgage Insurance.** Mortgage Insurance reimburses Lender (or any entity that purchases the Agreement and the Account) for certain losses it may incur if Borrower does not repay the Account as agreed. Borrower is not a party to the Mortgage Insurance.

If Lender required Mortgage Insurance as a condition of entering into the Agreement and establishing the Account, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect.

10. **Assignment of Miscellaneous Proceeds; Forfeiture.** The Miscellaneous Proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or any part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Security Instrument.

If the Property is damaged and if the restoration or repair is economically feasible and Lender's security is not lessened, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had

an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

If Lender believes the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, then Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** When Borrower (as that term is defined above) includes more than one person, Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Agreement (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Agreement without the co-signer's consent.

Subject to the provisions of Section 17, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 19) and benefit the successors and assigns of Lender.

**13. Account Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security



Instrument, as allowed under Applicable Law, including, but not limited to, attorneys' fees resulting from any suit or activity, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender shall have the authority to impose additional fees and charges to perform services requested by or on behalf of Borrower, or to otherwise administer and service the Agreement and the Account to the extent permitted by Applicable Law. The additional fees and charges may include administrative costs incurred by Lender and/or in reimbursement of payments made by Lender to third parties. Such fees and charges may include, without limitation, any and all costs or fees associated with the origination and/or servicing of such Agreement and the Account, document copy or preparation fees, transmittal, facsimile or delivery fees, reconveyance and release fees, property inspections and returned check or insufficient funds charged in connection with payments made by or on behalf of Borrower under the Agreement and all other such fees for ancillary services performed by Lender for Borrower or at Borrower's request or for services necessitated by or resulting from Borrower's default or malfeasance relating to this Security Instrument or the Agreement or incurred by Lender or assessed upon Borrower pursuant to the provisions of this Security Instrument or the Agreement. Such fees and charges shall be secured by this Security Instrument up to the amount of the Credit Limit and, unless Borrower and Lender agree to other terms of payment, shall bear interest from the date assessed by Lender at the rate stated in the Agreement, and in effect from time to time, and shall be payable, with interest, immediately following written demand from Lender to Borrower requesting payment thereof. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law. The absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee.

If either the Agreement or the Account is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other charges collected or to be collected in connection with the Agreement and the Account exceed the permitted limits, then: (a) any such charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Agreement or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment. Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower may have arising out of such overcharge.

**14. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**15. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Agreement conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Agreement which can be given effect without the conflicting provision.



As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**16. Borrower's Copy.** Borrower shall be given one copy of the Agreement and of this Security Instrument.

**17. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 17, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 14 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**18. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Agreement as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, as allowed under Applicable Law; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 17.

**19. Sale of Agreement/Account; Change of Loan Servicer; Notice of Grievance.** The Agreement and the Account, or a partial interest in the Agreement and the Account (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects the Periodic Payments due under the Agreement and this Security Instrument and performs other mortgage loan servicing obligations under the Agreement, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Agreement and the Account. If there is a change of the Loan Servicer, if required under Applicable Law, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Agreement and the Account are sold and thereafter the Agreement and the Account are serviced by a Loan Servicer other than the purchaser of the Agreement and the Account, the mortgage loan servicing obligations will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the purchaser of the Agreement and the Account unless otherwise provided by the purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 14) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this Section 19. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 21 and the notice of acceleration given to Borrower pursuant to Section 17 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 19.

**20. Hazardous Substances.** As used in this Section 20: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including, but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**21. Events of Default; Acceleration; Remedies. The occurrence of any one or more of the following events shall, at the election of Lender, constitute an "Event of Default," and shall entitle Lender to terminate the Agreement and the Account and accelerate the indebtedness secured hereby: (a) any Borrower engages in fraud or material misrepresentation, whether by action or omission, in connection with any phase of the Agreement; (b) Borrower fails to meet the repayment terms set forth in the Agreement; or (c) Borrower's action or inaction adversely affects the Property or Lender's security interest, including, but not limited to, Borrower's actions or omissions that constitute "Events of Default" under the Agreement, or Borrower's failure to perform any material covenants or agreements contained in this Security Instrument.**

**Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 17 unless**

Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 21, including, but not limited to, costs of title evidence.

**22. Discharge.** Upon request from Borrower and upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**23. Certain Other Advances.** In addition to any other sum secured hereby, this Security Instrument shall also secure the unpaid principal balance of, plus accrued interest on, any amount of money loaned, advanced or paid by Lender to or for the account and benefit of Borrower, after this Security Instrument is delivered to and filed with the Recorder's Office, CUYAHOGA County, Ohio, for recording. Lender may make such advances in order to pay any real estate taxes and assessments, insurance premiums plus all other costs and expenses incurred in connection with the operation, protection or preservation of the Property, including to cure Borrower's defaults by making any such payments which Borrower should have paid as provided in this Security Instrument, it being intended by this Section 23 to acknowledge, affirm and comply with the provision of § 5301.233 of the Revised Code of Ohio.

**24. Release.** The spouse of Borrower, if any, has executed this Security Instrument for the purpose of mortgaging and releasing (and does hereby so mortgage and release) all of such spouse's rights of dower in the Property.

<div align="center">

REQUEST FOR NOTICE OF DEFAULT
——————— AND FORECLOSURE UNDER SUPERIOR ———————
MORTGAGES OR DEEDS OF TRUST

</div>

Borrower and Lender request the holder of any mortgage, deed of trust or other encumbrance with a lien which has priority over this Security Instrument to give notice to Lender, at Lender's address set forth on page two of this Security Instrument, of any default under the superior encumbrance and of any sale or other foreclosure action.

———————————————— *[Signatures on Following Page]* ————————————————



BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____       _____ (Seal)
                                       JEFFREY D BROWN                    -Borrower
                                                                          [Printed Name]

_____       _____ (Seal)
                                       MARITSA BROWN                      -Borrower
                                                                          [Printed Name]

                                       _____ (Seal)
                                                                          -Borrower
                                                                          [Printed Name]

                                       _____ (Seal)
                                                                          -Borrower
                                                                          [Printed Name]

———————————————————— *[Acknowledgment on Following Page]* ————————————————————

State of _OHio_                    §
                                   §
County of _CUYAHOGA_               §


      Before me the undersigned authority, on this day personally appeared   JEFFREY D BROWN and MARITSA BROWN , _HUSBAND & Wife_
                                                                                 ,
known to me (or proved to me through an identity card or other document) to be the person(s) whose name is subscribed to the foregoing instrument, and acknowledged to me that he/she/they executed the same for the purposes and consideration therein expressed.

      Given under my hand and seal on this     _19_     day of _Sert_   _2007_ .

(Seal)



    SEAN HANNA
    Notary Public
In and for the State of Ohio
 My Commission Expires
  September 22, 2010

_____
Notary Public
My Commission Expires:


**This instrument was prepared by:**

---

_[Company Name]_

---

_[Street Address]_

---, ---

_[City, State Zip Code]_

Ohio Open-End Mortgage – Secondary Lien
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
                                  Page 15 of 15

# EXHIBIT C

CUYAHOGA COUNTY RECORDER
LILLIAN J GREENE - 1
RELA 4/12/2010 2:19:49 PM

**201004120381**

Loan #: 

When Recorded Return To:
OneWest Bank, FSB
C/O NTC 2100 Alt. 19 North
Palm Harbor, FL 34683

## ASSIGNMENT OF MORTGAGE

**FOR GOOD AND VALUABLE CONSIDERATION,** the sufficiency of which is hereby acknowledged, the undersigned, **FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC FEDERAL BANK, FSB, SUCCESSOR TO INDYMAC BANK, F.S.B., WHOSE ADDRESS IS 6900 BEATRICE DR. , KALAMAZOO, MI 49009, (ASSIGNOR),,** by these presents does convey, grant, sell, assign, transfer and set over the described mortgage together with the certain note(s) described therein together with all interest secured thereby, all liens, and any rights due or to become due thereon to **OneWest Bank, FSB, WHOSE ADDRESS IS 888 E. WALNUT STREET , PASADENA, CA 91101, ITS SUCCESSORS OR ASSIGNS, (ASSIGNEE).**
Said mortgage executed by: **JEFFREY D BROWN AND MARITSA BROWN** (current owner) and recorded in the record of mortgages Volume page and/or Instrument # 200709250739 in the office of the Recorder of · CUYAHOGA, Ohio.

More particularly described as follows (if needed), to wit:

This assignment is made without recourse, representation or warranty, express or implied, by the FDIC in any capacity.
IN WITNESS WHEREOF, the undersigned has hereunto set its corporate hand by its proper officer this 25th day of January in the year 2010
**FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC FEDERAL BANK, FSB, SUCCESSOR TO INDYMAC BANK, F.S.B.**

By: _____
    BRYAN BLY
    ATTORNEY-IN-FACT

STATE OF FLORIDA    COUNTY OF PINELLAS
Before me, the undersigned, a Notary Public in and for said County, personally appeared BRYAN BLY of FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC FEDERAL BANK, FSB, SUCCESSOR TO INDYMAC BANK, F.S.B. who as such officer for and on its behalf acknowledged the execution of the foregoing instrument. Witness my hand and Notary Seal this 25th day of January in the year 2010

_____
CRYSTAL MOORE    Notary Public
My commission expires: 09/23/2013

> CRYSTAL MOORE
> Notary Public, State of Florida
> Commission # DD 927242
> Expires September 23, 2013
> Bonded Through National Notary Assn.

**Prepared by: Jessica Fretwell/NTC,2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152**

form5/FRMOHX1



This form must be type written or computer generated.



**State of Utah**
**DEPARTMENT OF COMMERCE**
**Division of Corporations & Commercial Code**
**Articles of Merger / Share Exchange**

Entity Number:

Non-Refundable Processing Fee:
- [ ] Domestic $37.00
- [✓] Foreign $37.00

CiT Bank

the non-surviving corporation

Into

OneWest Bank, National Association (to be renamed CIT Bank, National Association)

the surviving corporation

## ARTICLE I - Surviving Corporation

### Section 1

The name of the corporation surviving the merger is CIT Bank, National Association

and such name [✓] **has** [ ] **has not** been changed as a result of the merger.

The principal address of the surviving corporation is:

888 East Walnut Street, Pasadena, CA 91101

| Address | City | State | Zip |

### Section 2

A. The surviving corporation is a domestic corporation existing pursuant to the provisions of the Utah Revised Business

Corporation Act incorporated on _____

B. The surviving corporation is a foreign corporation incorporated under the laws of the ~~State of~~

United States (and located in California) _____ and [✓] **qualified** [ ] **not qualified** to do business in Utah.

*Note:* If application for Certificate of Authority to Transact Business is filed concurrently herewith state "Upon approval of Application for Certificate of Authority." See Note 1 below.

C. The effective date of the merger described herein shall be the date upon which these Articles are filed with the

Utah Division of Corporations and Commercial Code, or August 3, 2015 (at the time specified in the Agreement and Plan of Merger)

## ARTICLE II - Non-surviving Corporation(s)

The name, state of incorporation, and date incorporation or qualification (if applicable) respectively, of each Utah domestic corporation and/or foreign corporation, other than the survivor, which is party to the merger are as follows:

Name of Corporation: CIT Bank

State of Domicile: Utah     Date of Incorporation / Qualification in Utah: March 20, 2000

Name of Corporation: _____

State of Domicile: _____ Date of Incorporation / Qualification in Utah: _____

Name of Corporation: _____

State of Domicile: _____ Date of Incorporation / Qualification in Utah: _____

Name of Corporation: _____

State of Domicile: _____ Date of Incorporation / Qualification in Utah: _____

Name of Corporation: _____

State of Domicile: _____ Date of Incorporation / Qualification in Utah: _____

## ARTICLE III - Plan of Merger or Share Exchange

The Plan of Merger or Share Exchange, containing such information as required by Utah Code 16-10a-1101, is set forth in "Exhibit A", attached hereto and made a part hereof.

Under GRAMA (63-2-201), all registration information maintained by the Division is classified as public record. For confidentiality purposes, you may use the business entity physical address rather than the residential or private address of any individual affiliated with the entity.

01:14

(1) As a national bank, CIT Bank, National Association is qualified under federal law to do business in any state in the United States.

**ARTICLE IV - Manner of Adoption & Vote of Surviving Corporation (must complete Section 1 or 2)**
**Section 1**
☐ Shareholder vote not required. The merger/ share exchange was adopted by the incorporators or board of directors without shareholder action and shareholder action was not required.

**Section 2**
☑ Vote of shareholders (complete either A or B) The designation (*i.e., common, preferred or any classification where different classes of stock exist*), number of outstanding shares, number of votes entitled to be cast by each voting group entitled to vote separately on the merger / share exchange and the number of votes of each voting group represented at the meeting is set forth below:

A. Unanimous written consent executed on July 27, _____, 20 15 and signed by all shareholders entitled to vote.

B. Vote of shareholders during a meeting called by the Board of Directors.

| | TOTAL | A | B | C |
|---|---|---|---|---|
| Designation of each voting group (i.e. preferred and common) | | | | |
| Number of outstanding shares | | | | |
| Number of votes entitled to be cast | | | | |
| Number of votes represented at meeting | | | | |
| Shares voted in favor | | | | |
| Shares voted against | | | | |

**ARTICLE V - Manner of Adoption & Vote of Non-surviving Corporation (must complete Section 1 or 2)**
**Section 1**
☐ Shareholder vote not required. The merger/ share exchange was adopted by the incorporators or board of directors without shareholder action and shareholder action was not required.

**Section 2**
☑ Vote of shareholders (complete either A or B) The designation (i.e., common, preferred or any classification where different classes of stock exist), number of outstanding shares, number of votes entitled to be cast by each voting group entitled to vote separately on the merger / share exchange and the number of votes of each voting group represented at the meeting is set forth below:

A. Unanimous written consent executed on July 24, _____, 20 15 and signed by all shareholders entitled to vote.

B. Vote of shareholders during a meeting called by the Board of Directors.

| | TOTAL | A | B | C |
|---|---|---|---|---|
| Designation of each voting group (i.e. preferred and common) | | | | |
| Number of outstanding shares | | | | |
| Number of votes entitled to be cast | | | | |
| Number of votes represented at meeting | | | | |
| Shares voted in favor | | | | |
| Shares voted against | | | | |

In Witness Whereof, the undersigned being the Secretary _____
of the surviving corporation executes these Articles of Merger / Share Exchange and verifies, subject to penalties of perjury that the statements contained herein are true, this 29th day of July _____, 20 15.

_Jules Vogel_

Signature                    Jules Vogel

_____             Printed Name

Mailing/Faxing Information: www.corporations.utah.gov contactus.html   Division's Website: www.corporations.utah.gov

State of Utah
Department of Commerce
Division of Corporations and Commercial Code
I hereby certify that the foregoing has been filed
and approved on this

'03   Aug  15

in the office of this Division and hereby issued
a certificate thereof.

Examined _____ ta _____ 8-3-15

Kathy Berg
Division Director

01/14

# AGREEMENT AND PLAN OF MERGER
## OF
## CIT BANK
## WITH AND INTO
## ONEWEST BANK, NATIONAL ASSOCIATION

**THIS AGREEMENT AND PLAN OF MERGER**, dated as of July 22, 2015 (this "Agreement"), is made and entered into between OneWest Bank, National Association ("OWB") and CIT Bank ("CITB").

## WITNESSETH:

**WHEREAS**, OWB, OCC Charter No. 718129, is a national banking association duly organized and existing under the laws of the United States with its main office located at 888 East Walnut Street, Pasadena, California;

**WHEREAS**, OWB has authorized capital stock consisting of 10,000,000 shares of common stock, par value $1.00 per share ("OWB Common Stock"), of which 10,000,000 shares of common stock are issued and outstanding as of the date hereof;

**WHEREAS**, OWB is wholly-owned by IMB Holdco LLC, a registered bank holding company and Delaware limited liability company with its main office in Pasadena, California ("IMB");

**WHEREAS**, CITB is a commercial bank duly organized and existing under the laws of the State of Utah with its main office located at 2150 South 1300 East, Suite 400, Salt Lake City, Utah;

**WHEREAS**, CITB has authorized capital stock consisting of 5,000,000 shares of common stock, par value $10 per share ("CITB Common Stock"), of which 500,000 shares of common stock are issued and outstanding as of the date hereof;

**WHEREAS**, CITB is wholly-owned by CIT Group Inc., a registered financial holding company and a Delaware corporation with its principal executive offices in New York, New York ("CIT Group");

**WHEREAS**, CIT Group wholly-owns Carbon Merger Sub LLC, a Delaware limited liability company ("Merger Sub"), that CIT Group formed to effect the transactions that directly relate to the subject matter of the Subsidiary Merger Agreement (as defined below);

**WHEREAS**, CIT Group, Merger Sub and IMB are parties to that certain Agreement and Plan of Merger, dated as of July 21, 2014 (as it may be amended from time to time, the "Subsidiary Merger Agreement"), pursuant to which, subject to the terms and conditions of the Subsidiary Merger Agreement, IMB shall merge with and into Merger Sub (the "Subsidiary Merger"), whereby (A) the corporate existence of IMB shall cease and Merger Sub shall

continue its corporate existence as the surviving company in the Subsidiary Merger and (B) OWB shall become a wholly-owned direct subsidiary of Merger Sub,

**WHEREAS** the parties intend that upon consummation of the Bank Merger, subject to the approval of the Office of the Comptroller of the Currency, the existing main office of OWB will be designated as the main office of CITB, National Association, and

**WHEREAS**, the respective boards of directors of OWB and CITB, acting pursuant to resolutions duly adopted pursuant to the authority given by, and in accordance with, applicable law, have approved this Agreement and authorized the execution hereof

**NOW, THEREFORE**, in consideration of the promises and of the mutual agreements herein contained, the parties hereto do hereby agree as follows

## 1 - THE MERGER

### 1.1    Merger; Surviving Bank

Subject to the terms and conditions of this Agreement at the Effective Time (as hereinafter defined) CITB shall be merged with and into OWB, pursuant to the provisions of, and with the effect provided in, applicable law (said transaction, the "Bank Merger") and the corporate existence of CITB shall cease OWB shall continue its corporate existence under the laws of the United States and shall be the entity surviving the Bank Merger (the "Surviving Bank") The parties hereto intend that the Bank Merger qualify as a "reorganization" within the meaning of Section 368(a) of the Internal Revenue Code of 1986 as amended (the "Code") and this Agreement shall be and is hereby adopted as, a 'plan of reorganization' for purposes of Sections 354 and 361 of the Code

### 1.2    Articles of Incorporation and Bylaws

From and after the Effective Time (as defined in Section 1 3 below), the Articles of Incorporation of OWB as in effect as of the date hereof
shall be the Articles of Incorporation of the Surviving Bank until thereafter amended in accordance with applicable law provided that at the Effective Time such Articles of Incorporation shall be amended to change the name of the Surviving Bank to  CIT Bank, National Association"  From and after the Effective Time, the Bylaws of OWB as in effect as of the date hereof                                          shall be the Bylaws of the Surviving
Bank until thereafter amended in accordance with applicable law, provided that at the Effective Time such Bylaws shall be amended to fix the number of directors at the number provided for in Section 1 6 of this Agreement and to change the name of the Surviving Bank to 'CIT Bank National Association"

### 1.3    Effective Time of Merger

Unless OWB and CITB agree otherwise, the Bank Merger will take place two (2) minutes following the effective time of the Subsidiary Merger, subject to the satisfaction of the conditions set forth in Section 3 1  The date and time of such effectiveness is herein referred to as the "Effective Time"

### 1.4    Effect of Merger

All assets of CITB as they exist at the Effective Time shall pass to and vest in the Surviving Bank without any conveyance or other transfer  The Surviving Bank shall be responsible for all of the liabilities of every kind and description, including, but not limited to, liabilities arising from any operation of a trust department, of the merging institutions existing as of the Effective Time of the Bank Merger

### 1.5    Business of Surviving Bank

The business of the Surviving Bank after the Bank Merger shall continue to be that of a national banking association and shall be conducted at its main office which shall be located at 888 East Walnut Street, Pasadena, California, and at all legally established branches

### 1.6    Directors

OWB and CITB shall take such actions as are necessary, including changing the size of the Board of Directors of the Surviving Bank, if necessary, such that (i) from and after the Effective Time the Board of Directors of the Surviving Bank consists of (A) 9 of the members of the CIT Group Board of Directors immediately following the closing of the Subsidiary Merger (which nine members shall include Alan Frank and Steven Mnuchin), (B) Nelson Chai and (C) Joseph Otting and (ii) following the Effective Time, shall also include one (1) independent director to be selected by CIT Group and added to the Board of Directors of the Surviving Bank promptly following the Effective Time  Directors of the Surviving Bank shall serve until their successors shall have been duly elected or appointed and qualified, or their earlier death, resignation or removal, in each case, in accordance with the Articles of Incorporation and Bylaws of the Surviving Bank

## 2 - TREATMENT OF SHARES

### 2.1    Treatment of Shares

At the Effective Time, by virtue of the Bank Merger and without any action on the part of the holder thereof  (a) each share of CITB common stock issued and outstanding immediately prior to the Effective Time shall cease to be outstanding and shall be cancelled and (b) the shares of OWB common stock issued and outstanding immediately prior to the Effective Time shall remain outstanding, shall be unchanged after the Bank Merger and shall immediately after the Effective Time constitute all of the issued and outstanding capital stock of the Surviving Bank

## 3 - CONDITIONS PRECEDENT

### 3.1    Conditions

The respective obligations of the parties to effect the Bank Merger shall be subject to the satisfaction at or prior to the Effective Time of the following conditions

(a)    Shareholder Approval  The Agreement shall have been approved by the sole shareholder of each of OWB and CITB

-3-

(b)     <u>Regulatory Approvals</u>   The approval of the Board of Governors of the Federal Reserve System to effect the Subsidiary Merger and the transactions related thereto and the approval of the Office of the Comptroller of the Currency consummate the transactions contemplated by this Agreement including the Bank Merger, shall have been obtained and shall remain in full force and effect and all statutory waiting periods in respect thereof shall have expired

(c)     <u>No Injunctions or Restraints</u>   There shall not be in effect any order, injunction or decree by any court or agency of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the Bank Merger   There shall not be any law enacted, entered promulgated or enforced by any governmental entity which prohibits or makes illegal consummation of the Bank Merger

(d)     <u>Subsidiary Merger</u>   The Subsidiary Merger shall have been consummated in accordance with the terms and conditions of the Subsidiary Merger Agreement

## 4 - TERMINATION AND AMENDMENT

### 4.1     <u>Termination</u>

Notwithstanding the approval of this Agreement by the sole shareholder of each of OWB or CITB, this Agreement shall terminate forthwith prior to the Effective Time in the event the Subsidiary Merger Agreement is terminated as therein provided   This Agreement may also be terminated at any time by mutual written consent of the parties hereto

### 4.2     <u>Amendment</u>

This Agreement may not be amended, except by an instrument in writing signed on behalf of each of the parties hereto

## 5 - MISCELLANEOUS

### 5.1     <u>Representations and Warranties</u>

Each of the parties hereto represents and warrants that this Agreement has been duly authorized, executed and delivered by such party and constitutes the legal, valid and binding obligation of such party  enforceable against it in accordance with the terms hereof

### 5.2     <u>Assurances</u>

If at any time the Surviving Bank shall consider or be advised that any further assignments conveyances or assurances are necessary or desirable to vest, perfect or confirm in the Surviving Bank title to any property or rights of CITB or otherwise carry out the provisions hereof, the proper officers and directors of CITB, as of the Effective Time, and thereafter the officers of the Surviving Bank acting on behalf of CITB, shall execute and deliver any and all proper assignments, conveyances and assurances, and do all things necessary or desirable to vest, perfect or confirm title to such property or rights in the Surviving Bank and otherwise carry out the provisions hereof

-4-

### 5.3     <u>Governing Law</u>

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to any applicable conflicts of law, except to the extent federal law may be applicable

### 5.4     <u>Successors and Assigns</u>

This Agreement is binding upon and is for the benefit of the parties hereto and their respective successors and permitted assigns, provided, however, that neither this Agreement nor any rights or obligations hereunder may be assigned by any party hereto to any other person without the prior consent in writing of the other party hereto

### 5.5     <u>Counterparts</u>

This Agreement may be executed in counterparts each of which shall be deemed an original, but all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each of the parties and delivered to the other parties, it being understood that all parties need not sign the same counterpart

[*Signature page follows*]

-5-

**IN WITNESS WHEREOF**, each of the parties hereto has caused this Agreement to be executed by its duly authorized officers, all as of the date first set forth above

<div style="margin-left:40%">

ONEWEST BANK, NATIONAL
ASSOCIATION

By _____
     Name
     Title




CIT BANK


By _____
     Name
     Title

</div>

*[Signature page to Agreement and Plan of Merger]*

**IN WITNESS WHEREOF**, each of the parties hereto has caused this Agreement to be executed by its duly authorized officers all as of the date first set forth above

ONEWEST BANK, NATIONAL
ASSOCIATION

By _____
Name
Title

CIT BANK

By _____
Name Nelson Chai
Title Chairman + CEO

*[Signature page to Agreement and Plan of Merger]*

 **Office of the Comptroller of the Currency**

February 20, 2014

Mr. David Fawer
Vice Chairman
OneWest Bank, FSB
888 East Walnut Street
Pasadena, CA 91101

Re:    Application to convert OneWest Bank, FSB, Pasadena, California, to a national banking association with the title of OneWest Bank, National Association, charter number 25079 and to conduct fiduciary activities.

      OCC Control Numbers:

Dear Mr. Fawer:

The Comptroller of the Currency (OCC) has reviewed your application to convert OneWest Bank, FSB to a national bank and retain all its branches. After a thorough review of all information available, and reliance upon the representations and commitments made in the application and by the bank's representatives, we find that your conversion application meets the requirements for conditional approval to convert to a national banking association pursuant to 12 CFR 5.24. The converting bank will operate under the title of OneWest Bank, National Association, headquartered in Pasadena, California, charter number 25079.

This conversion approval is subject to the following special condition:

> Within ten (10) days after consummation of the conversion, OneWest Bank, National Association's Board of Directors shall execute a Stipulation and Consent to the Issuance of a Consent Order agreeing to the OCC's issuance of a Consent Order ("OCC Order") requiring OneWest Bank, National Association to adhere to the provisions of OTS Order WN-11-011 issued by the Office of Thrift Supervision on April 13, 2011 ("OTS Order"), which requires OneWest Bank, FSB to take certain actions to address its residential mortgage servicing and its initiation and handling of foreclosure proceedings. The provisions of the OTS Order shall be incorporated by reference into the OCC Order as if fully set forth therein. The OTS Order is administered by the OCC, pursuant to the

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. Law
No. 111-203, § 311, 124 Stat. 1520-21 (2010), since July 21, 2011, and
pursuant to the OCC Order, OneWest Bank, National Association will be
required to adhere to the provisions and requirements of the OTS Order as
though it remained in full force and effect subsequent to the charter
conversion.

The condition of this approval is a condition "imposed in writing by a Federal banking
agency in connection with any action on any application, notice, or other request" within
the meaning of 12 USC 1818. As such, the condition is enforceable under 12 USC 1818.

The OCC has no objection to the converted bank continuing to hold the thirty-one active
and conforming operating subsidiaries listed in the application. These entities engage in
activities that fall under the following categories: (1) holding and managing other real
estate owned for sale; (2) holding and managing certain loans secured by commercial real
estate, consumer construction loans, and lot loans; (3) providing personnel-related
services to the bank and its affiliates, including payroll, human resources support, and
employee benefits programs; and (4) holding and managing bank investments in
mortgage-backed securities, asset-backed securities, and whole loans. These activities are
permissible for national bank operating subsidiaries. 12 CFR 5.34(e)(5)(v)(A), (B), (D),
(Z), and (CC).

In addition to the conforming subsidiaries, the bank owns OneWest Services LLC. Some
of the activities performed by OneWest Services LLC are not permissible for national
banks. In a letter dated October 31, 2013 the Board of Directors made certain
commitments regarding subsidiaries including a commitment to discontinue all of the
activities of OneWest Services LLC within one year of the bank's conversion.

This letter constitutes official OCC authorization to operate all of the branches of
OneWest Bank, FSB as branches of the converted national bank. A detailed list of the
branches and their assigned OCC branch certificate numbers will follow under separate
cover following the effective date of the conversion.

If the bank desires to close a branch, the requirements of 12 USC 1831r-1 must be met,
including the submission of a 90-day advance notice of the proposed branch closing to
the OCC. Following the branch closing, a final closing notice should be submitted to the
OCC and the branch authorization must be surrendered. In the event a branch is sold, the
branch authorization should also be surrendered to the OCC.

The OCC also approves your proposal to conduct fiduciary powers pursuant to 12 USC
92a. This approval constitutes a permit to conduct the fiduciary powers requested in your
application. 12 CFR 5.26(e)(4).

You will note that 12 CFR 9.4 places responsibility on the board of directors for the
proper exercise of the bank's fiduciary powers. However, the board may decide whether

2

it shall supervise the administration of all such powers directly or assign any function related to such powers to any director, officer, employee, or committee.

The board should also provide for:

- A proper delineation of duties for trust officer(s) and committee(s).

- The pledging of securities to secure trust funds on deposit in the bank as required by 12 CFR 9.10(b).

- The designation of the officers or employees responsible for custody of the trust investments in conformity with 12 CFR 9.13(a).

- The deposit of securities with state authorities where required by local law, according to 12 CFR 9.14.

If the bank decides to surrender its fiduciary powers, it should notify the OCC in accordance with 12 CFR 9.17(a).

You are reminded that the following items must be satisfactorily addressed on or before the effective date of the conversion:

1. The institution must purchase adequate fidelity bond coverage in accordance with 12 CFR 7.2013, which lists the four factors the directors should consider to determine adequacy.

2. If a director, officer, employee or principal shareholder of the bank (including an entity in which such person owns an interest of 10 percent or more) is involved in the sale of credit life insurance to loan customers, the bank should ensure compliance with 12 CFR Part 2, which, among other things, prohibits a covered person from retaining commissions or other income from the sale of credit life insurance connected with any loan the bank makes.

3. The board of directors must adopt and have in place policies, practices and procedures to ensure the safe and sound operation of the bank. The board also must review those policies, practices, and procedures continually and ensure the bank's compliance with them. We are enclosing the *Minimum Policies and Procedures* for national banks.

4. The bank has represented that it intends to maintain its membership in the Federal Home Loan Bank (FHLB) system. If, at any time the bank ceases to be a member of the FHLB system, it must use its best efforts, including contacting the appropriate FHLB or the Federal Housing Finance Board, to dispose of any stock in the FHLB. The OCC will consider this stock a nonconforming asset for any period that the bank is not a member of the FHLB system.

3

5. The converting institution must apply to the Federal Reserve for membership.

6. The converting institution must ensure that all other required regulatory approvals have been obtained. Final authorization to operate as a national bank will not be given to an institution with a bank holding company until the Federal Reserve Board has approved the holding company.

7. The directors must own qualifying shares in conformance with 12 USC 72 and 12 CFR 7.2005.

8. If the converting institution is subject to the Home Mortgage Disclosure Act (HMDA), the bank must ensure that its reporter identification number included on its HMDA transmittal sheet is changed to reflect its new OCC charter number.

9. The converting institution must notify the OCC if the facts described in the filing materially change at any time prior to consummation of the conversion. Any changes to the executive officers or directors prior to conversion must receive a "no objection" from the OCC.

Upon completion of all steps required to convert to a national banking association, submit the "Conversion Completion Certification" (enclosed) certifying that you have done so. Please provide the OCC with at least 10 days advance notice of the conversion.

When the institution has satisfactorily completed all of the above steps, the OCC will issue a Conversion Completion Acknowledgment officially authorizing the institution to commence business as a national banking association. Shortly after conversion, you will receive the charter certificate.

If the conversion is not consummated within six months from the date of the decision, the approval will automatically terminate unless the OCC grants an extension of the time period. The OCC is opposed to granting extensions, except under the most extenuating circumstances and expects the conversion to occur as soon as possible.

OCC handbooks, manuals, issuances, and selected other publications are available in electronic form on our Web site http://www.occ.gov/. If you would like to subscribe to be notified when new OCC bulletins or alerts are issued, please see the instructions at http://www.occ.gov/rss/index-rss.html.

This conditional approval and the activities and communications by OCC employees in connection with the filing do not constitute a contract, express or implied, or any other obligation binding upon the OCC, the United States, any agency or entity of the United States, or any officer or employee of the United States, and do not affect the ability of the OCC to exercise its supervisory, regulatory and examination authorities under applicable law and regulations. Our approval is based on the bank's representations, submissions, and information available to the OCC as of this date. The OCC may modify, suspend or rescind this approval if a material change in the information on which the OCC relied

4

occurs prior to the date of the transaction to which this decision pertains. The foregoing may not be waived or modified by any employee or agent of the OCC or the United States.

All correspondence regarding this application should reference the OCC control number. If you have any questions, contact Senior Licensing Analyst David Finnegan at (720) 475-7650, or email David.Finnegan@occ.treas.gov.

A separate letter is enclosed requesting your feedback on how we handled your application. We would appreciate your response so we may continue to improve our service.


Sincerely,

*signed*

James A. Bundy
Director for District Licensing.


Enclosures:  Conversion Completion Certification
             Minimum Policies and Procedures
             Survey Letter



BROWN, JEFFREY D. & MARITSA
4848 LINCOLNSHIRE CT
BROADVIEW HEIGHTS, OH. 44147

# Value History

**Tax year: 2018 - Total Value: $400,300**

|  |  | Tax | Exempt |  | Abated |
|---|---|---|---|---|---|
| Land Use Code |  | 5100 |  |  |  |
| Land |  | $81,600 | $ |  | $ |
| Building |  | $318,700 | $ |  | $ |
| Total |  | $400,300 | $ |  | $ |

**Tax year: 2017 - Total Value: $376,600**

**Tax year: 2016 - Total Value: $376,600**

**Tax year: 2015 - Total Value: $376,600**

**Tax year: 2014 - Total Value: $358,700**

**Tax year: 2013 - Total Value: $358,700**

**Tax year: 2012 - Total Value: $358,700**

**Tax year: 2011 - Total Value: $359,100**

**Tax year: 2010 - Total Value: $358,000**

**Tax year: 2009 - Total Value: $358,000**

**Tax year: 2008 - Total Value: $384,900**

**Tax year: 2007 - Total Value: $384,900**

**Tax year: 2006 - Total Value: $384,900**

**Tax year: 2005 - Total Value: $361,700**

**Tax year: 2004 - Total Value: $361,700**

**Tax year: 2003 - Total Value: $361,700**

Top   View Map



**U.S. BANKRUTPCY COURT**
**NORTHERN DISTRICT OF OHIO (CLEVELAND)**

| | |
|---|---|
| IN RE: | CASE NO. 16-13420-jps |
| MARITSA BROWN | CHAPTER 13 |
| | JUDGE Jessica E. Price Smith |
| Debtors | CIT BANK, N.A.'S RELIEF FROM STAY WORKSHEET |
| | **4848 LINCOLNSHIRE COURT, BROADVIEW HEIGHTS, OH 44147** |

## I.  LOAN DATA

   A.  IDENTIFICATION OF COLLATERAL (check all that apply):

   [X] Real Estate - **4848 Lincolnshire Court, Broadview Heights, OH 44147**

   [X] Principal Residence of Debtors

   [ ] Other

   [ ] Personal Property – Describe.  Include VIN or other identification

   [ ] Debtor's Chapter 13 Plan provides for surrender of the Collateral

   [ ] Other Property – Describe.

   B.  2019 VALUE OF COLLATERAL: $400,300.00

   C.  SOURCE OF COLLATERAL VALUATION: Cuyahoga County Auditor Report

   D.  ORIGINAL LENDER: IndyMac Bank, F.S.B., A federally Chartered Savings Bank

   E.  ENTITY ENTITLED TO ENFORCE THE NOTE: CIT Bank, N.A.

   F.  CURRENT LOAN SERVICER: LoanCare, LLC

   G.  DATE OF LOAN:  September 19, 2007

   H.  ORIGINAL PRINCIPAL AMOUNT DUE UNDER NOTE:  $36,000.00

   I.  ORIGINAL INTEREST RATE ON NOTE: 8.750%

   J.  CURRENT INTEREST RATE: 0.0000%

   K.  ORIGINAL MONTHLY PAYMENT AMOUNT (principal and interest only for mortgage loans): $1.00

   L.  CURRENT MONTHLY PAYMENT AMOUNT: $100.00

   M.  THE CURRENT MONTHLY PAYMENT AMOUNT LISTED ABOVE:

   [ ] Includes an escrow amount of $_____ for real estate taxes.

   [ ] Includes an escrow amount of $_____ for property insurance.

[ ] Includes an escrow amount of $0.00 for taxes and insurance.

[X] Does not include any escrow amount.

N.  DATE LAST PAYMENT RECEIVED: February 6, 2015

O.  AMOUNT OF LAST PAYMENT RECEIVED: $49.73

P.  AMOUNT HELD IN SUSPENSE ACCOUNT: $0.00

Q.  NUMBER OF PAYMENTS PAST DUE: 39

## II. AMOUNT ALLEGED TO BE DUE AS OF OCTOBER 1, 2019

|    | Description of Charge | Total Amount of Charges | Number of Charges Incurred | Dates Charges Incurred |
|----|----|----|----|----|
| A. | PRINCIPAL | $31,440.42 | - | - |
| B. | INTEREST | $ 732.01 | - | - |
| C. | ESCROW ADVANCE (taxes, and insurance) | $0.00 | - | - |
| D. | INSURANCE | See Line "C" | - | - |
| E. | LATE FEES | $0.00 | | |
| F. | NON-SUFFICIENT FUNDS FEES | $0.00 | | |
| G. | PAY-BY-PHONE FEES | $0.00 | | |
| H. | BROKER PRICE OPINIONS | $195.00 | | |
| I. | FORCE-PLACED INSURANCE | $0.00 | | |
| J. | PROPERTY INSPECTIONS | $0.00 | | |
| K. | OTHER CHARGES | $0.00 | | |

TOTAL DEBT:                                          $ _____ 32,367.43 _____
LESS AMOUNT HELD IN SUSPENSE:           ( _____ 0.00) _____

TOTAL DUE AS OF DATE MOTION IS FILED:   $ _____ 32,367.43* _____
* This total cannot be relied upon as a payoff quotation

III. AMOUNT OF ORIGINAL PRE-PETITION ARREARAGES: $2,119.00

IV. AMOUNT OF ALLEGED POST-PETITION DEFAULT

| | Description of Charge | Amount | Number | Date Incurred From / To | | Total |
|---|---|---|---|---|---|---|
| A. | PAYMENTS | $100.00 | 39 | 07/01/19 | 10/01/19 | $3,900.00 |
| B. | POST-PETITION PAYMENTS ADVANCED FOR TAXES (if not included in payments amount above) | | | | | |
| C. | POST-PETITION PAYMENTS ADVANCED FOR INSURANCE (if not included in payment amount above) | | | | | |
| D. | LATE FEES | | | | | |
| E. | NON-SUFFICIENT FUNDS FEES | | | | | |
| F. | PAY-BY-PHONE FEES | | | | | |
| G. | BROKER PRICE OPINIONS | | | | | |
| H. | FORCE-PLACED INSURANCE | | | | | |
| I. | PROPERTY INSPECTION | | | | | |
| J. | OTHER CHARGES | | | | | |

TOTAL ACCRUED:               $_____3,900.00
LESS SUSPENSE BALANCE:   ($_____0.00)
TOTAL POST-PETITION DEBT:  $_____3,900.00

**V. This paragraph deviates from the standard form in this jurisdiction: Movant has not received any payments post-petition. Therefore, a payment history is not attached.**

This worksheet was prepared by:

_/s/ Steven H. Patterson_

Steven H. Patterson (0073452)
Reisenfeld & Associates LLC
3962 Red Bank Road
Cincinnati, OH 45227
voice: (513) 322-7000
facsimile: (513) 322-7099
e-mail: ohbk@rslegal.com